# Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach From Congressional Subpoena

The Assistant to the President and Director of the Office of Political Strategy and Outreach ("OPSO") is immune from the House Committee on Oversight and Government Reform's subpoena to compel him to testify about matters concerning his service to the President in the OPSO.

July 15, 2014

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether Assistant to the President and Director of the Office of Political Strategy and Outreach ("OPSO") David Simas is legally required to appear to testify at a congressional hearing scheduled for July 16, 2014, in response to a subpoena issued to Mr. Simas by the House Committee on Oversight and Government Reform on July 10, 2014. We understand that the Committee seeks testimony about "whether the White House is taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act," and about "the role and function of the White House Office of Political Strategy and Outreach." Letter for David Simas from the Hon. Darrell Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives (July 3, 2014) ("Invitation Letter"). For the reasons set forth below, we believe that Mr. Simas is immune from compulsion to testify before the Committee on these matters, and therefore is not required to appear to testify in response to this subpoena.

## I.

### A.

The Executive Branch's longstanding position, reaffirmed by numerous Administrations of both political parties, is that the President's immediate advisers are absolutely immune from congressional testimonial process. *See, e.g.*, Memorandum for the Hon. John D. Ehrlichman, Assistant to the President for Domestic Affairs, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Power of Congressional Committee to Compel Appearance or Testimony of "White House Staff"* at 7 (Feb. 5, 1971) ("Rehnquist Memorandum").[1] This immunity is rooted in the constitutional separation of powers, and in

---

[1] *See also* Letter to Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 1, 2007); *Immunity of Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. __ (July 10, 2007) ("Bradbury Memorandum"), *available at* http://www.justice.gov/olc.opinions.htm; *Assertion of Execu-*

the immunity of the President himself from congressional compulsion to testify. As this Office has previously observed, "[t]he President is the head of one of the independent Branches of the federal government. If a congressional committee could force the President's appearance" to testify before it, "fundamental separation of powers principles—including the President's independence and autonomy from Congress—would be threatened." *Immunity of Former Counsel to the President from Compelled Congressional Testimony*, 31 Op. O.L.C. __, at *2 (July 10, 2007) ("Bradbury Memorandum"), *available at* http://justice.gov/olc/opinions.htm. In the words of one President, "[t]he doctrine [of separation of powers] would be shattered, and the President, contrary to our fundamental theory of constitutional government, would become a mere arm of the Legislative Branch of the Government if he would feel during his term of office that his every act might be subject to official inquiry and possible distortion for political purpose." Texts of Truman Letter and Velde Reply, N.Y. Times, Nov. 13, 1953, at 14 (reprinting November 11, 1953 letter by President Truman). Thus, just as the President "may not compel congressmen to appear before him," "[a]s a matter of separation of powers, Congress may not compel him to appear before it." *Assertion of Executive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1, 4 (1999) ("*Assertion of Executive Privilege*") (quoting Memorandum for Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 2 (July 29, 1982)).

For the President's absolute immunity to be fully meaningful, and for these separation of powers principles to be adequately protected, the President's immediate advisers must likewise have absolute immunity from congressional compulsion to testify about matters that occur during the course of discharging their official duties. "Given the numerous demands of his office, the President must rely upon senior advisers" to do his job. Bradbury Memorandum at *2. The President's immediate advisers—those trusted members of the President's inner circle "who customarily meet with the President on a regular or frequent basis," Rehnquist Memorandum at 7, and upon whom the President relies directly for candid and sound advice—are in many ways an extension of the President himself.

*tive Privilege with Respect to Clemency Decision*, 23 Op. O.L.C. 1 (1999); *Immunity of the Counsel to the President from Compelled Congressional Testimony*, 20 Op. O.L.C. 308 (1996); Memorandum to Edward C. Schmults, Deputy Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel (July 29, 1982); Letter for Rudolph W. Giuliani, Associate Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Demand for Deposition of Counsel to the President Fred F. Fielding* (July 23, 1982); Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Testimony by Presidential Assistants* (Apr. 14, 1981); Memorandum for Margaret McKenna, Deputy Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Dual-Purpose Presidential Advisers* (Aug. 11, 1977); Memorandum for the Hon. John W. Dean III, Counsel to the President, from Ralph E. Erickson, Assistant Attorney General, Office of Legal Counsel, *Re: Appearance of Presidential Assistant Peter M. Flanigan Before a Congressional Committee* (Mar. 15, 1972).

They "function[] as the President's alter ego, assisting him on a daily basis in the formulation of executive policy and resolution of matters affecting the military, foreign affairs, and national security and other aspects of his discharge of his constitutional responsibilities," including supervising the Executive Branch and developing policy. *Assertion of Executive Privilege*, 23 Op. O.L.C. at 5; *see also Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) (the Constitution "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," including "the enforcement of federal law" and the "management of the Executive Branch"); *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997) ("The President himself must make decisions relying substantially, if not entirely, on the information and analysis supplied by advisers."). "Given the close working relationship that the President must have with his immediate advisors as he discharges his constitutionally assigned duties," "[s]ubjecting [those advisors] to the congressional subpoena power would be akin to requiring the President himself to appear before Congress on matters relating to the performance of his constitutionally assigned executive functions." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 5.

In particular, a congressional power to compel the testimony of the President's immediate advisers would interfere with the President's discharge of his constitutional functions and damage the separation of powers in at least two important respects. First, such a power would threaten the President's "independence and autonomy from Congress." Bradbury Memorandum at *2; *cf. Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 370, 385 (2004) (citing the President's need for autonomy and confidentiality in holding that courts must consider constraints imposed by the separation of powers in fashioning the timing and scope of discovery directed at high-level presidential advisers who "give advice and make recommendations to the President"). Absent immunity for a President's closest advisers, congressional committees could wield their compulsory power to attempt to supervise the President's actions, or to harass those advisers in an effort to influence their conduct, retaliate for actions the committee disliked, or embarrass and weaken the President for partisan gain. Such efforts would risk significant congressional encroachment on, and interference with, the President's prerogatives and his ability to discharge his duties with the advice and assistance of his closest advisers. They also would promote a perception that the President is subordinate to Congress, contrary to the Constitution's separation of governmental powers into equal and coordinate branches.

Second, a congressional power to subpoena the President's closest advisers to testify about matters that occur during the course of discharging their official duties would threaten executive branch confidentiality, which is necessary (among other things) to ensure that the President can obtain the type of sound and candid advice that is essential to the effective discharge of his constitutional duties. The Supreme Court has recognized "the necessity for protection of the public interest

in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *United States v. Nixon*, 418 U.S. 683, 708 (1974). "A President and those who assist him," the Court has explained, "must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.* The prospect of compelled interrogation by a potentially hostile congressional committee about confidential communications with the President or among the President's immediate staff could chill presidential advisers from providing unpopular advice or from fully examining an issue with the President or others.

To be sure, the President's advisers could invoke executive privilege to decline to answer specific questions if they were required to testify. *See, e.g.*, Rehnquist Memorandum at 8 & n.4. But the ability to assert executive privilege during live testimony in response to hostile questioning would not remove the threat to the confidentiality of presidential communications. An immediate presidential adviser could be asked, under the express or implied threat of contempt of Congress, a wide range of unanticipated and hostile questions about highly sensitive deliberations and communications. In the heat of the moment, without the opportunity for careful reflection, the adviser might have difficulty confining his remarks to those that do not reveal such sensitive information. Or the adviser could be reluctant to repeatedly invoke executive privilege, even though validly applicable, for fear of the congressional and media condemnation she or the President might endure. These concerns are heightened because, in a hearing before a congressional committee, there is no judge or other neutral magistrate to whom a witness can turn for protection against questions seeking confidential and privileged information. The committee not only poses the questions to the witness, but also rules on any objections to its own questions according to procedures it establishes. The pressure of compelled live testimony about White House activities in a public congressional hearing would thus create an inherent and substantial risk of inadvertent or coerced disclosure of confidential information relating to presidential decisionmaking—thereby ultimately threatening the President's ability to receive candid and carefully considered advice from his immediate advisers. To guard against these harms to the President's ability to discharge his constitutional functions and to the separation of powers, immediate presidential advisers must have absolute immunity from congressional compulsion to testify about matters that occurred during the course of the adviser's discharge of official duties.[2]

---

[2] A number of senior presidential advisers have voluntarily testified before Congress as an accommodation to a congressional committee's legitimate interest in investigating certain activities of the Executive Branch. These instances of voluntary testimony do not undermine the Executive Branch's long-established position on absolute immunity. Unlike compelled testimony, voluntary testimony by a senior presidential adviser represents an affirmative exercise of presidential autonomy. It reflects a decision by the President and his immediate advisers that the benefit of providing such testimony as an accommodation to a committee's interests outweighs the potential for harassment and harm to Executive Branch confidentiality. Such testimony, moreover, may be provided on terms negotiated to

**B.**

This longstanding Executive Branch position is consistent with relevant Supreme Court case law. The Court has not yet considered whether Congress may secure the testimony of an immediate presidential adviser through compulsory process. But in an analogous context, the Court did conclude that legislative aides are entitled to immunity under the Speech or Debate Clause that is co-extensive with the immunity afforded Members of Congress themselves. *See Gravel v. United States*, 408 U.S. 606 (1972). "It is literally impossible," the Court explained, "for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Id.* at 616. Legislative aides must therefore "be treated as . . . alter egos" of the Members they serve. As a result, they must be granted the same immunity as those Members in order to preserve "the central role of the Speech or Debate Clause," which is "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Id.* at 617.

The Court's reasoning in *Gravel* supports the position that the President's immediate advisers must share his absolute immunity from congressional compulsion to testify. As noted above, the President's immediate advisers are his "alter egos," allowing him to fulfill the myriad responsibilities of his office in a way it would be "literally impossible" for him to do alone. A congressional power to compel their testimony would (as we have discussed) undermine the President's independence, create the appearance that the President is subordinate to Congress, and impair the President's ability to receive sound and candid advice, thereby hindering his ability to carry out the functions entrusted to him by the Constitution. Subjecting immediate presidential advisers to congressional testimonial process would thus "diminish[] and frustrate[]" the purpose of the President's own absolute immunity from such process—just as in *Gravel*, denying "Speech or Debate" immunity to legislative aides would have "diminished and frustrated" the protections granted to Members of Congress under that clause. *Gravel*, 408 U.S. at 617.

To be sure, in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Court rejected a claim of absolute immunity made by senior presidential advisers. But it did so in the context of a civil suit against those advisers for money damages. In our view, *Harlow*'s holding that presidential advisers are generally entitled to only qualified immunity in suits for money damages should not be extended to the context of congressional subpoenas for the testimony of immediate presidential advisers, because the separation of powers concerns that underlie the need for absolute immunity from congressional testimonial compulsion are not present to the same

focus and limit the scope of the questioning. Because voluntary testimony represents an exercise of presidential autonomy rather than legally required compliance with congressional will, it does not implicate the separation of powers in the same manner, or to anything like the same extent, as compelled testimony.

degree in civil lawsuits brought by third parties. *But see Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 100–02 (D.D.C. 2008) (reading *Harlow* to preclude absolute immunity for senior presidential advisers from compulsion to testify before Congress).

As explained above, subjecting an immediate presidential adviser to Congress's subpoena power would threaten the President's autonomy and his ability to receive sound and candid advice. Both of these prospective harms would raise acute concerns related to the separation of powers. A suit for damages brought by a private party does not raise comparable separation of powers concerns. It is true that such a suit involves a judicially supervised inquiry into the actions of presidential advisers, and that the threat of financial liability from such a suit may chill the conduct of those advisers. *See Harlow*, 457 U.S. at 814; *Miers*, 558 F. Supp. 2d at 101–02. But, in civil damages actions, the Judiciary acts as a disinterested arbiter of a private dispute, not as a party in interest to the very lawsuit it adjudicates. Indeed, the court is charged with impartially administering procedural rules designed to protect witnesses from irrelevant, argumentative, harassing, cumulative, privileged, and other problematic questions. *Cf., e.g.*, Fed. R. Civ. P. 26(b); Fed. R. Evid. 103. And mechanisms exist to eliminate unmeritorious claims. *See, e.g.*, Fed. R. Civ. P. 12(b), (c), (e), (f); Fed. R. Civ. P. 56. In contrast, in the congressional context (as noted earlier), the subpoenaing committee is both the interested party and the presiding authority, asking questions that further its own interests, and setting the rules for the proceeding and judging whether a witness has failed to comply with those rules. In part for these reasons, a congressional proceeding threatens to subject presidential advisers to coercion and harassment, create a heightened impression of presidential subordination to Congress, and cause public disclosure of confidential presidential communications in a way that the careful development of evidence through the judicially monitored application of the Federal Rules of Civil Procedure does not.

*Harlow* also contains a discussion of *Gravel*, in which the Court rejected the defendants' argument that, as "alter egos" of the President, they should be entitled to absolute immunity from civil claims for damages, derivative of the absolute immunity afforded the President. But we do not think *Harlow*'s discussion undermines the relevance of *Gravel* to the issue of immunity from congressional compulsion to testify. In *Harlow*, the Court conceded that the defendants' claim of absolute immunity based on *Gravel* was "not without force," but concluded that the argument would "sweep[] too far," because it would imply that Cabinet officials too should enjoy derivative absolute immunity, and the Court had already decided (in *Butz v. Economou*, 438 U.S. 478 (1978)) that Cabinet officials— "Presidential subordinates some of whose essential roles are acknowledged by the Constitution itself"—were entitled to only qualified immunity. *Harlow*, 457 U.S. at 810.

Given the dissimilarities between civil suits for damages and compelled congressional testimony just discussed, it is doubtful that this discussion in *Harlow* (or the holding in *Butz*) bears much on the question of whether immediate presidential advisers have absolute immunity from congressional compulsion to testify. Further, even if it is appropriate to harmonize the immunity afforded Cabinet officials and presidential advisers in the context of suits for damages, the same is not true in the context of compelled congressional testimony. This is because the prospect of compelled congressional testimony by a President's immediate advisers would, as a general matter, be significantly more damaging to the separation of powers than the prospect of compelled testimony by a Cabinet official. As a Department head, a Cabinet officer is confirmed by the Senate, and her authority and functions are generally established by statute. It may be a significant part of her regular duties to testify before Congress about the implementation of laws that Congress has passed. *Cf.* Rehnquist Memorandum at 8–9. By contrast, an immediate presidential adviser is appointed solely by the President, without Senate confirmation, and his role is to advise and assist the President in the performance of the President's constitutionally assigned functions. The separation of powers concerns identified above—the threats to both the independence of the presidency and the President's ability to obtain candid and sound advice—are significantly more acute in the case of close personal advisers than high-ranking Executive Branch officials who do not function as the President's "alter egos." *Cf. Harlow*, 457 U.S. at 828 (Burger, C.J., dissenting) (faulting the Court majority for "fail[ing] to distinguish the role of a President or his 'elbow aides' from the role of Cabinet officers, who are department heads rather than 'alter egos,'" and stating that "[i]t would be in no sense inconsistent to hold that a President's personal aides have greater immunity than Cabinet officers"); *id.* at 810 n.14 (majority) (acknowledging Chief Justice Burger's argument and noting that "it is impossible to generalize about the role of 'offices' in an individual President's administration" because some individuals have served simultaneously in both presidential advisory and Cabinet positions).[3]

Similarly, in *United States v. Nixon*, the Supreme Court expressly distinguished the privilege issues arising in criminal cases from the privilege issues that would

---

[3] The *Harlow* Court also observed that civil suits for money damages against presidential advisers "generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself." 457 U.S. at 811 n.17. This observation is consistent with *Nixon v. Fitzgerald*, a case decided the same day as *Harlow*, in which the Court held that the President "is entitled to absolute immunity from damages liability predicated on his official acts." 457 U.S. 731, 749 (1982). This logic too suggests that the President's immediate advisers should be absolutely immune from congressional compulsion to testify, because (as we have explained) compelling immediate presidential advisers to testify before Congress would risk serious harm to the separation of powers that is closely related to the harm that would be caused by compelling the President himself to appear, and because absolute immunity for the President's immediate advisers is necessary to render the President's own immunity fully meaningful.

arise in the context of compelled congressional testimony. In *Nixon*, the Court held that the President could assert only a qualified, rather than an absolute, privilege to resist a subpoena for tape recordings and documents issued in the course of a criminal proceeding brought against certain third parties. 418 U.S. 683; *see also Sealed Case*, 121 F. 3d at 753–57 (presidential communications privilege may be overcome by need for information in a grand jury investigation). But the Court made clear that it was "not . . . concerned with the balance between the President's . . . confidentiality interest and congressional demands for information." *Nixon*, 418 U.S. at 712 n.19; *see also id.* ("We address only the conflict between the President's assertion of a generalized privilege of confidentiality and the constitutional need for relevant evidence in criminal trials."); *Sealed Case*, 121 F.3d at 753 (recognizing that the unique "constitutional considerations" in the "congressional-executive context" render limitations on executive privilege in the judicial context inapposite). Particularly in light of this explicit statement, we do not believe *Nixon* casts doubt on the President's—and by extension his immediate advisers'—immunity from congressional compulsion to testify. As with liability for private suits for damages, requiring the President to comply with a third-party subpoena in a criminal case is very different from—and has very different separation of powers implications than—requiring him to comply with a congressional subpoena for testimony. This is so in at least two respects.

First, as the Court explained in *Cheney*, "the need for information in the criminal context is" particularly weighty "because 'our historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that the twofold aim of [criminal justice] is that guilt not escape or innocence suffer.'" 542 U.S. at 384 (quoting *United States v. Nixon*, 418 U.S. at 708–09) (internal quotation marks omitted) (alterations in original)). Outside the criminal context, "the need for information . . . does not share the [same] urgency or significance." *Id*. Comparing the informational need of congressional committees with that of grand juries, for instance, the en banc Court of Appeals for the D.C. Circuit explained that "while factfinding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events. . . . In contrast, the responsibility of the grand jury turns entirely on its ability to determine whether there is probable cause to believe that certain named individuals did or did not commit specific crimes." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc).

Second, the potentially harmful effect on the President's ability to carry out his duties and on the separation of powers is more serious in the context of subpoenaed congressional testimony than in the context of compulsory judicial process in a criminal case. As in the civil context, the criminal justice system imposes "various constraints, albeit imperfect, to filter out insubstantial legal claims" and minimize the damage to the President's ability to discharge his duties, such as

prosecutorial discretion (with its attendant ethical constraints) and Federal Rule of Criminal Procedure 17. *Cheney*, 542 U.S. at 386. Congress is not subject to such constraints. And, of course, a criminal subpoena does not raise the prospect of the President (or one of his immediate advisers) being summoned at Congress's will to appear before it to respond to a hearing conducted entirely on the terms and in the manner Congress chooses.

Two lower-court cases also bear mention. In *Senate Select Committee*, the Court of Appeals for the D.C. Circuit addressed a President's obligation to comply with a congressional subpoena, and concluded that the President could not assert a generalized claim of executive privilege to absolutely immunize himself from turning over certain tape recordings of presidential conversations. 498 F.2d 725. Again, we do not believe this holding undermines our conclusion that the President and his immediate advisers are absolutely immune from congressional compulsion to testify. In our view, Congress summoning a President to appear before it would suggest, far more than Congress compelling a President to turn over evidence, an Executive subordinate to the Legislature. In addition, when Congress issues a subpoena for documents, the Executive Branch may take time to review the request and object to any demands that encroach on privileged areas. Any documents that are produced may be redacted where necessary. By contrast (and as already discussed), a witness testifying before Congress may, in the heat of the moment and under pressure, inadvertently reveal information that should remain confidential.

Finally, in *Committee on Judiciary v. Miers*, the District Court for the District of Columbia considered a question very similar to the one raised here, and concluded that a former Counsel to the President was not entitled to absolute immunity from congressional compulsion to testify. 558 F. Supp. 2d at 99. The court's analysis relied heavily on *Harlow*, *Harlow*'s discussion of *Gravel*, and *Nixon*. *See* 558 F. Supp. 2d at 99–105. For the reasons set forth above, we believe those cases do not undermine the Executive Branch's longstanding position that the President's immediate advisers are immune from congressional compulsion to testify. We therefore respectfully disagree with the *Miers* court's analysis and conclusion, and adhere to the Executive Branch's longstanding view that the President's immediate advisers have absolute immunity from congressional compulsion to testify.

## C.

Applying this longstanding view, we believe that Mr. Simas has such immunity. We understand that Mr. Simas spends the majority of his time advising or preparing advice for the President. He is a member of a group of the President's closest advisers who regularly meet with the President, as often as several times a week. In addition, Mr. Simas frequently meets with the President alone and with other advisers, at the President's or Mr. Simas's request. *See* Rehnquist Memoran-

dum at 7 (President's "immediate advisers" are "those who customarily meet with the President on a regular or frequent basis"). Mr. Simas is responsible for advising the President on such matters as what policy issues warrant his attention. He also advises the President on how his policies are being received, and on how to shape policy to align it with the needs and desires of the American public. Mr. Simas thus plays a crucial role in deciding how best to formulate and communicate the President's agenda across a wide range of policy issues. In these respects, Mr. Simas's duties are comparable to those of other immediate advisers who we have previously recognized are entitled to absolute immunity from congressional compulsion to testify. *See, e.g.*, Letter to Fred F. Fielding, Counsel to the President, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel (Aug. 1, 2007) (immunity of President Bush adviser Karl Rove); Bradbury Memorandum (immunity of Counsel to President Bush Harriet Miers). Consistent with these precedents, we likewise conclude that Mr. Simas has absolute immunity from compulsion to testify before Congress about his service to the President in the Office of Political Strategy and Outreach.

## II.

For the reasons discussed above, we believe that Mr. Simas is entitled to immunity that is "absolute and may not be overborne by [the Committee's] competing interests." *Assertion of Executive Privilege*, 23 Op. O.L.C. at 4. But even if Mr. Simas were only entitled to qualified immunity, which could be overcome by a sufficient showing of compelling need, we would conclude that the Committee had not made the requisite showing.

## A.

No court has yet considered the standard that would be used to determine whether a congressional committee's interests overrode an immediate presidential adviser's immunity from congressional compulsion to testify, assuming that immunity were qualified rather than absolute. But two decisions of the Court of Appeals for the D.C. Circuit suggest possible standards. In *Senate Select Committee*, in the context of a presidential assertion of executive privilege against a congressional subpoena for tape recordings of conversations between the President and his Counsel, the court held that the Committee could overcome the assertion only by showing that "the subpoenaed evidence is demonstrably critical to the responsible fulfillment of [its] functions." 498 F.2d at 731; *see also McGrain v. Daugherty*, 273 U.S. 135, 176 (1927) (congressional oversight power may be used only to "obtain information in aid of the legislative function"). And in *Sealed Case*, the court held that "in order to overcome a claim of presidential privilege raised against a grand jury subpoena, it is necessary to specifically demonstrate why it is likely that the evidence contained in presidential communications is

important to the ongoing grand jury investigation and why this evidence is not available from another source." 121 F.3d at 757. (To be "important" to an investigation, "the evidence sought must be directly relevant to issues that are expected to be central to the trial." *Id.* at 754.)

In our view, *Senate Select Committee* would provide the more appropriate standard for assessing whether a congressional committee's assertion of need had overcome an immediate presidential adviser's qualified testimonial immunity. As explained above, judicial proceedings—including criminal proceedings—differ in fundamental ways from congressional hearings. Because the *Senate Select Committee* standard was articulated in the congressional oversight context, and because it seeks to preserve the President's prerogatives while recognizing Congress's legitimate interest in information crucial to its legislative function, we believe it would be an appropriate standard for evaluating whether an immediate presidential adviser's qualified testimonial immunity has been overcome.

In applying this standard, it would be important to bear in mind the "implicit constitutional mandate" that the coordinate branches of government "seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). Through this accommodation process, which has been followed for decades, the political branches strive to avoid the "constitutional confrontation" that erupts when the President must make an assertion of privilege, or when an immediate presidential adviser's testimonial immunity must be invoked. *See Cheney*, 542 U.S. at 389–90 (quoting *United States v. Nixon*, 418 U.S. at 692); *see also id*. ("[C]onstitutional confrontation between the two branches should be avoided whenever possible.") (quotation marks omitted). Accordingly, before an immediate presidential adviser's compelled testimony could be deemed demonstrably critical to the responsible fulfillment of a congressional committee's legislative function, a congressional committee would, at a minimum, need to demonstrate why information available to it from other sources was inadequate to meet its legitimate needs. *See Senate Select Committee*, 498 F.2d at 732–33 (noting that, in light of the President's public release of partially redacted transcripts of the subpoenaed tapes, the court had asked the Select Committee to state "in what specific respects the [publicly available] transcripts . . . are deficient in meeting [its] need," and then finding that the Committee "points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes").

## B.

The Committee has not shown that Mr. Simas's testimony is demonstrably critical to the responsible fulfillment of its legislative function. The Committee's investigation began with a broad request for "all documents and communications, including e-mails, related or referring to the Office of Political Strategy and

Outreach or the reopening of the Office of Political Affairs," along with a request that White House officials brief Committee staff. Letter for Denis McDonough, White House Chief of Staff, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives at 4 (Mar. 18, 2014). Over the course of letters exchanged during the next three months, the White House explained that the Office engages only in activities that are permissible under the Hatch Act, and that the White House has taken steps to ensure that OPSO staff are trained in Hatch Act compliance. In response to those letters, the Committee reiterated its broad request for documents, but did not articulate particular unanswered questions or identify incidents in which OPSO staff may have violated the Hatch Act or related statutes. *See* Letter for the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives, from Kathryn H. Ruemmler, Counsel to the President (Mar. 26, 2014); Letter for Denis McDonough, White House Chief of Staff, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives at 1 & n.5 (May 27, 2014); Letter for the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives, from W. Neil Eggleston, Counsel to the President at 1–2 (June 13, 2014).

On July 3, 2014, the Committee requested Mr. Simas's testimony at a public hearing to understand "whether the White House is taking adequate steps to ensure that political activity by Administration officials complies with relevant statutes, including the Hatch Act," and to understand "the role and function of the White House Office of Political Strategy and Outreach." Invitation Letter. The Committee did not, however, identify any specific unanswered questions that Mr. Simas's testimony was necessary to answer. The White House responded with a letter providing additional information about White House efforts to ensure that OPSO was operating in a manner consistent with applicable statutes, and explaining that the activities cited by the Committee did not violate those statutes. *See* Letter for the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives, from W. Neil Eggleston, Counsel to the President (July 10, 2014). At that time, the White House also provided various documents reflecting its efforts to ensure that OPSO staff comply with relevant laws, including materials on the Hatch Act used in a mandatory training for all staff assigned to OPSO, e-mail correspondence demonstrating that OPSO staff were directed to read critical reports issued by the Office of Special Counsel and the Committee regarding the activities of the previous Administration's Office of Political Affairs, documentation of a meeting between lawyers from the White House Counsel's Office and the Office of Special Counsel concerning compliance with the Hatch Act, and a memorandum sent to all White House staff from the President's Counsel reminding them of the law governing political activity by federal employees. *See id*. at 3. Finally, the White House Counsel's Office offered

to brief the Committee to address any outstanding questions regarding OPSO's activities. *See id*.

After receiving these responses, the Committee, on Friday, July 11, 2014, subpoenaed Mr. Simas to testify at a public hearing on Wednesday, July 16. At the same time, the Committee indicated that it would accept the White House Counsel's Office's offer to brief the Committee, and would determine after the briefing whether to withdraw the subpoena for Mr. Simas's testimony. *See* Letter for W. Neil Eggleston, Counsel to the President, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives (July 11, 2014). The White House provided that briefing on Tuesday, July 15, the day before the hearing was to occur. Following the briefing, the Committee indicated that Mr. Simas's testimony remained necessary. It explained that, during the briefing, White House staff "declined to discuss compliance with the Committee's document requests or even describe the process and identify relevant officials involved in the decision to reopen the White House political office." Letter for W. Neil Eggleston, Counsel to the President, from the Hon. Darrell E. Issa, Chairman, Committee on Oversight and Government Reform, House of Representatives at 1 (July 15, 2014).

The Committee has not adequately explained why, despite the information it has already received concerning OPSO's activities and the White House's efforts to ensure compliance with relevant statutes, it requires Mr. Simas's public testimony in order to satisfy the legitimate aims of its oversight investigation. Although the Committee has now indicated that it needs additional information on two specific topics, it has not explained why it must obtain that information from Mr. Simas at a Committee hearing. And to the extent that the Committee has other "outstanding questions for Mr. Simas," *id.* at 2, the Committee has not identified them, let alone explained why he must answer them at a public hearing. At this point, it is not evident that further efforts at accommodation would be futile, and hence that compelling an immediate presidential adviser to testify before Congress is a justifiable next step. Because the Committee has not explained why (and it is not otherwise clear that) Mr. Simas's live testimony is "demonstrably critical" to the responsible fulfillment of the Committee's functions, we conclude that the Committee has not met the standard that would apply for overcoming Mr. Simas's immunity from congressional compulsion to testify, assuming that immunity were qualified rather than absolute.[4]

---

[4] Even if it were appropriate to apply the *Sealed Case* standard for overcoming qualified executive privilege in the context of congressional testimonial immunity, Mr. Simas's testimonial immunity would not have been overcome here. For the reasons set forth in the text, we do not believe that the Committee could show that the testimony it demands from Mr. Simas is directly relevant to issues that are central to the Committee's investigation *and* that the information that would be obtained through that testimony is not available from another source.

### III.

For the foregoing reasons, we conclude that Mr. Simas is immune from the House Committee on Oversight and Government Reform's subpoena to compel him to testify about matters concerning his service to the President in the Office of Political Strategy and Outreach.

KARL R. THOMPSON
*Acting Assistant Attorney General*
*Office of Legal Counsel*
